have a single case to be argued on the calendar this morning. Power Authority v. Bouchard. We have five submitted cases, and I would ordinarily dispense with reading the calendar in this circumstance, but because we are in this unusual format, I think I should call the argued case. So is Appellate Counsel ready, Mr. Foley, in Power Authority v. Bouchard? Yes, Your Honor, Vincent Foley. And Appellate Counsel is also present on the line? Yes, Your Honor, Gina Venezia for Bouchard. Thank you both. The other cases that are being submitted today are Smith v. Shaw's Supermarkets, Santana v. Barr, United States v. Talbert, United States v. Quillo, and Lombardo v. Graham, and we will take all those cases on submission. With that, I think we're ready to proceed in the argued case, and as I believe counsel has been informed, we're going to modify our usual practice and give you three minutes of uninterrupted time at the beginning of this argument, given the unusual format. So, Mr. Foley, you may proceed. Thank you, Your Honor. May it please the Court. My name is Vincent Foley. I represent the Power Authority of New York, or NYPA. NYPA spent almost $10 million to clean up an oil spill caused solely by defendants' negligent dropping of an anchor onto the Y-49 submarine cable, an oil-filled electric transmission cable buried about 10 feet below navigable waters underneath Long Island Sound. NYPA, as owner and operator of the cable, acted as a responsible party, engaged emergency response, oil spill cleanup contractors to contain the spill and to remove the oil. The District Court dismissed NYPA's third-party claims against defendants under OPA and directed its New York Oil Spill Law claim to be subject to Defendant's Limitation Act proceedings. In this case, OPA's Savings Revision 2718A applies to repeal the Limitation Act for the New York Oil Spill Law claim. The Savings Revision is a grant of authority to the states to impose any additional liability for discharge of oil or other pollution within state waters, notwithstanding OPA or the Limitation Act. The Savings Clause placement in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to Title I. This is exactly what the New York Oil Spill Law is. It's broad, strict liability for oil pollution within state waters. The District Court held that the Savings Revision is not applicable to preserve the New York Oil Spill Law claim unless OPA already applies. This is contrary to the plain meaning of the Savings Revision and a very narrow reading of the Savings Clause. If OPA applies, in most cases, you don't need to have the state oil spill law. It's when OPA does not apply that state oil spill laws come into play and are necessary to protect states' interests and to impose liability on polluters within state waters. Now, under the Savings Revision, additional liability is more or broader liability. The New York Oil Spill Law imposes additional liability against any person that discharges oil in New York state waters. There's no facility requirement. So this is additional liability. I'm sorry, you have one more minute. Thank you. So NYPA's claim, the New York Oil Spill Law claim should not be subject to the Shipowners Limitation Act. OPA intended to repeal the act for such state law points. The second point I'm going to address is facility. And we'll start with the background. Congress enacted OPA in 1990 and intended to supplement an existing patchwork of federal laws in order to put into one place in Title I of OPA a comprehensive federal framework for liability for oil discharge. The district court's unduly narrow reading of facility creates a new patchwork or a gap in the framework. Facility is intended to be broadly construed. It appears in OPA's liability section 2702 next to other broadly construed terms. Each responsible party for a vessel or facility from which oil is discharged. Responsible party, vessel, and oil are all very broadly construed. The placement of facility among these broad terms in a comprehensive federal framework for liability should be broadly construed. The Y-49 submarine table meets the facility definition. Mr. Foley, I think your three minutes are up, so I'll interrupt, and I'm going to turn it over to Judge Lohier if he has questions. But I'll start with one, and then it's in Judge Lohier. This one follows on with your immediate question or your most immediate remark. How do you address your adversary's argument that we should limit or construe the meaning of storing, handling, or transporting oil in light of the surrounding language in the statute that references exploring for drilling, producing, processing, or transporting oil? Well, the definition includes terms that refer to exploring, drilling, or producing, which connotes an offshore use of the facility. But it also includes storing, handling, transferring. Those are all uses that connote an onshore facility use. And facility is intended to cover both onshore and offshore facilities. So there's no reason for these terms to be – they're not ambiguous, so they can be interpreted based on their plain meaning. And the plain meaning of the terms support a use of the Y49 cable for storing, handling, and transferring oil. This is Judge Lohier. Do we have to accept this joint facility argument in order to agree with you and your reading of the text? Because it's hard for me to understand how the cable – I shouldn't say that it's hard for me to understand, but I'd like your view on how the electric cable by itself without the pressurization plant has as a purpose the handling, transferring, processing, or transporting of oil. The purpose of the cable, as I understand it, is to transport electricity. Well, yes. A purpose of the transmission cable is to transport electricity. But that purpose has nothing to do with oil. The statute's definition is that where the facility is used for one or more of the following purposes in connection with oil. So how is the facility used in connection with oil? Well, it very clearly stores, handles, and transfers oil under pressure. It's moving back and forth in the cable alone. Whether you look at the cable or the pumping stations together, the cable is used for the purpose of storing and transferring and handling oil during normal operation. And it's necessary for its function. So you can't have this electric transmission cable unless you have the containment of oil and the use of oil to allow it to perform the function of transmitting electricity. So the view is that the cable has actually dual functions. That's why it's a cable. It carries within it, I gather, something that transfers the electricity and also is meant to grease or to oil the interior so that there's no damage. Is that right? Yes, there's a core conductor that transmits the electricity that's surrounded by insulation, which is permeated with dielectric oil that serves as a lubricant and an insulant and also creates the environment for the electricity to be able to transmit under pressure. So to transmit electricity. But the definition of OPA suggests that there could and very often will be one or more purposes for the facility. So the district court just gave it a very narrow reading to focus on purpose and primary purpose. But there's no reason that we should do that in the case of a facility under OPA, which is a comprehensive federal framework for oil pollution. It's supposed to fill in all the gaps and for going forward, have a comprehensive scheme. So if we exclude things like this cable, we're creating a gap in the scheme for coverage. So there's no coverage for oil spills in navigable waters, which is the primary focus of the Oil Pollution Act. Judge Nardini, did you have any questions? I did. So focusing on your facility argument, I understand your argument about how you would contend that there is the district court focused on a primary purpose test, which you don't I'm going to ask you about the three verbs that are listed as possible purposes here that I think are the only three relevant storing, handling or transferring. I understand your argument about transferring is that there is oil that actually flows from one end of the pipeline back and forth in the course of maintaining the pressure in the cable. Is that correct? Yes. Transfer means to move back and forth. And that's what the oil does as it as the cable operates. If the cable operates, the conductor carries electricity and heat is generated. That heat has to be removed and it's done through the oil insulin. So your argument, if I'm I just want to make sure I'm characterizing it accurately, is that the cable is designed to transfer oil. That is one of the purposes of the cable. There may be another ulterior purpose why the oil is being transferred, which is to reduce heat or to lubricate or whatever. But your argument would be that you don't have to ask whether oil is being transferred for its own sake. Sort of the purpose of transferring doesn't have to be just transferring for its own sake. It could be for whatever purpose, as long as one of the purposes of the cable is to transfer oil. You're within the definition, correct? And if that the cable that the cable is used to transfer oil, that's what you're going to want to more the following purposes. And then can I just shift over to storing? Because when I look at the dictionary definition of storing, storing seems to imply not simply containing oil. I mean, you can say my shoes are containing my socks right now, but they're not storing my socks. But storing seems to imply laying away something for future use. So like when you put something in a warehouse, you're storing it so that someday you might use it, but you're not using it right now. So it struck me that if we look at the word storing, you would need to win on the joint facility argument, because I understand that you're indicating that the oil that's in the pipeline is actually being used to lubricate and to insulate, whereas potentially you might argue that there is a reservoir of oil onshore in the pressurization facilities that may or may not be used to pump into the cable at some later point. But could you just explain to me what is your position as to whether oil is being stored in the cable as opposed to being used? I mean, what do you view? Do you view the word store is simply synonymous with contained? No, the cables are being used to store the reservoir of oil that is used for the cable to operate. Now, it's not consuming that oil. It always maintains a constant under pressure, a reservoir of oil in the cable itself. And if you separate the pumping stations, which we think that the piece of equipment should be viewed in total, the whole piece of equipment and not just the cables, but even looking at the cables separately, the oil that is present in the cable is supporting its storage. So it's not that it's saved for a later use, but it is there because it needs a constant pressure. It needs to be fully engaged the whole time. And that's the storage. Go ahead, Judge. Where, where, where is that in the record? That is, where is this notion that the cables themselves store the oil as opposed to using the oil constantly as a lubricant to transfer back and forth down the line? Yeah, the EPA regulates this facility as a non-transportation related offshore facility. And the EPA definition includes a reference to industrial equipment, which is oil filled operational equipment. And that's what this cable falls into. And under the EPA guidance, it says that this industrial equipment, which is used or which uses or stores oil. And that's on the special appendix, page 82. So the cable itself. I'm sorry, I interrupted someone. I have one other site for the record. I think Judge Lohier asked for a site for the record. If you prefer, I'll take your question. Well, my question was that my understanding is that the cable itself holds about 2,500 gallons of oil in normal operation. Is that correct? Each cable holds 2,500 gallons during normal operation. So cable three held about 2,500 gallons of oil. And you referred this morning to insulation and temperature and temperature, I think. Isn't the oil and correct me if I'm misunderstanding the record. The oil helps also maintain the pressure that's necessary for the electricity to conduct. Yes, the cable maintains pressure, the oil pressure within the encasement of the cable. What that does is it creates the environment to transmit electricity without any gaps. So it's completely a fluid environment and it is conducive to transmission of electricity. And that's the reason for a need for some movements between the oil and the plants and into the cable and presumably out of the cable as that pressure as the pressure need varies. Am I understanding the physics of it correctly? Yes. I think that's right. That the heat increases the pressure and then the heat needs to be relieved. And it does so by the dielectric fluid working back and forth and cooling the conductor. OK. So whether you call it storing or handling or transferring, the oil has to be there in order for the cable to fulfill its ultimate purpose. Yes. Yes. OK. Can I can I just ask the United States at one point in its brief reads the provision to say me to read the purpose to mean something like the reason for something's existence. And it says even with that reading of the of the statute, the cable would would constitute a facility for the purpose of the statute. But isn't that reading to the extent it's plausible? Doesn't that make your argument harder? Because you can't say that the cable itself nor the pressure plants were built for the ultimate purpose of holding or transporting transporting oil. And this purpose is subsidiary to the reason for their existence. And which is to try electricity. Why isn't that a plausible read of the statute? I think it's essentially the one the district court adopted. I understand that the the the district court acknowledged that the primary purpose of the cable was to transmit electricity. But the Department of Justice argument I understood, I mean, that there's nothing in the facility definition that requires the purpose in the definition to be the ultimate and only purpose. And the language refers to one or more of several enumerated purposes, and it should be given a broad reading. The district court acknowledged that the cables are used to some extent for handling, transferring and storing oil, but didn't think that it that it reached a purpose and a purpose of the cable. But when you look at the context of the definition, the storing, handling and transferring the use of the facility for storing, handling and transferring is in connection with the oil. And the reason it is in connection with the oil, because this is the Oil Pollution Act. And if the cable is contains oil under pressure all the time is a threat of an oil spill in navigable waters. This is the type of facility that should be included in the definition for facility under the Oil Pollution Act. So, this is just Lohier. What was the purpose, in your view, of defining the facility by its purpose or purposes? Because I think you're suggesting that is not what occurs, for example, in the Clean Water Act. No, the Clean Water Act has the same definitions for offshore facility and onshore facility as OPA does. It just doesn't have its own definition of facility. So, what is the reason for having purpose in the definition? Yes, yes. I think you could enumerate several categories of functions for which a facility that contains oil should be a target of liability under the Oil Pollution Act. So, the responsible party is the liable party. The vessel and the facility, those are the things from which oil is discharged. So, that's what the statute is looking at, to get to the facilities from which oil is discharged so that the owner or operator of that facility can be the responsible party and can take all the actions they're supposed to take under the Oil Pollution Act. You can see the district court's read. I mean, by your read, it seems to me you would say, and maybe this is the right interpretation of the statute, perhaps it well is, but your adversary uses the example of a Honda Civic that crashes into a marine terminal and leaks fuel from its gas tank. I think you could talk about a lawnmower that to some extent stores oil and transfers it from one part of the lawn to the other, but we don't generally think of the purpose of the lawnmower or the car as being to hold and handle oil. And I guess by your interpretation, if the oil found its way into a waterway from either of those devices, it would be regulated by the statute. Well, the statute's definition is very broad. It includes, at the end, the last sentence, the term includes any motor vehicle, rolling stock, or pipeline. So, I think the intent... No, no, but it ends with used for one or more of these purposes. Right. So, I don't think we have to get out to the far extremes of application of the facility definition for this case. This is a large scale industrial use of oil beneath navigable waters. These cables, there's four cables extending 7.9 miles across Long Island Sound with 2,500 gallons of oil each cable and another 10,000 in the reservoir that maintains the cables. So, this is nothing like an automobile that leaks oil from a bridge at a marine facility. Judge Nardini and Judge Lohier, did either of you have additional questions at this time? No, this is Judge Nardini. No, thank you very much. I have just one question. You started, counsel, on the limitation liability issue? Yes, and I wondered if you could tell me, how is this a collateral order? I mean, this is, that part of it is, it seems to me, something that you, once damages are assessed, can come back up to us. So, why do we have, why should we review that? Well, the district court's order was a final and dispositive order on application of the OPA savings clause to allow this New York oil spill law claim to proceed in a separate action. We were denied that right under OPA, and that was a final appealable order. So, we have jurisdiction under 28 U.S.C. 1291. How is that a final order? All it does is cap liability, correct? Well, it interprets the savings provision to say that we are not entitled, no, it doesn't cap liability. It interprets the savings provision to say that we are not allowed to proceed outside of the limitation act. So, we will have to pursue that claim in the limitation act proceeding, and we won't be able to appeal, in any other matter, the interpretation of 2718A to preserve our right to proceed without limitation. Thank you. Thank you. We'll hear from Appalachia Council. Hold on, let me get my phone up. Good morning. May it please the court. Gina Venegia for Bouchard. The issues before the court are primarily ones of statutory construction, but those should not be examined in a vacuum or based on scenarios not present here. The issues should be analyzed by reference to the facts that are contained in this record. The district court examined all of those facts on summary judgment motions presented by both parties. Both parties agreed there is no issues of fact. The district court properly concluded that OPA does not apply. This bill is a Clean Water Act bill, a CWA bill. Accordingly, its provision, and not 2718, applies. But, as your honors correctly point out, the district court's order with respect to 2718 is a collateral order. It is not presently appealable, and contrary to what counsel just said, they will be able to appeal these issues if and when the district court decides the limitation of liability issues in that case. If we are determined to limit our liability, then NIPA will be at liberty to include in its appeal should 5-1 any questions related to 2718. And if the district court determines that we are not entitled to limit, there is no need for this court to examine those issues related to 2718 unless that limitation finding is reversed. Now, the other thing to remember is NIPA is not without a remedy. There is no gap here. The Clean Water Act has been in existence for quite some time. It provides the remedy. Now, there is no dispute here, and everyone agrees that this case involves a spill of dielectric fluid from a power transmission cable. Everyone also agrees that the purpose of the cable is to transmit electricity across Long Island Sound. Do you have one more minute? Sure. It uses the fluid as a coolant and insulator. The record reveals that the fluid is static within the cable during normal operation, and that's JA-52. Further, NIPA's own witnesses admitted that there is no storage of fluid along the cable. This is JA-61. NIPA's witnesses further explained in testimony, JA-61, that the fluid is, quote, being used in the cable for a specific purpose, close quotes. The cable does use the fluid. No one contends otherwise. But a facility that merely uses fluid or uses oil is not a facility within the meaning of OPA. Let me intervene, and again, I won't use the time, but I'll start with a question and then let Judge Lohier jump in. But doesn't a plain-meaning approach to the statute pose something of a problem for you? I mean, the definition, it's only if we take the district court's interpretation of purpose. The statute itself doesn't limit the purpose to one purpose only or to the ultimate purpose. And the definition of facility encompasses equipment used for one or more of storing, handling, or transferring oil. And whichever of those you choose, this cable is an oil duct with the capacity to contain 2,500 gallons of oil. It has to contain that oil in order to function. And the cable is purpose-built to fulfill that necessity. I mean, I'm sure, I guess this case seems to oscillate between purpose-driven and plain-meaning approaches. But to me, it seems like the plain-meaning approach is the big problem for you. So help me out. What am I missing? Sure, Your Honor. I think that, you know, there's a couple of things to consider. You're correct. What the statute says, facility means a structure which is used for one or more of the following purposes. And then lays forth the purposes. And I think when you're looking at the definition of facility, it will assist the analysis to compare and contrast the definition of the word vessel. Vessel is defined under OPA as every description of a watercraft. Every. Much broader language. I think it is also helpful to the analysis to recognize that at the time OPA was created, they had the Clean Water Act. OPA did borrow verbatim the definitions of onshore and offshore facilities from the Clean Water Act. But OPA did go a step further and add a provision, a definition for facility that applies to the OPA definitions of onshore and offshore facilities. Clean Water Act does not have that. So this has to mean something. The decision to include a special definition facility, the decision to use the word used for one or more of the following purposes has to mean something. At the same time OPA was enacted, we also had the Clean Water Act regulations. And when you turn to the Clean Water Act regulations and you look at how they define facilities in the regulations, they talk about facilities that produce, gather, store, process, refining. And then they added that also use or consume oil. This is 40 CFR 112.1B. You also see a reference to facilities in which oil is used. That's 40 CFR 112.1B. Doesn't this cable use oil? Absolutely it does. And that is why it is a facility under the Clean Water Act. That's precisely our point. It is a facility under Clean Water Act. I guess my problem with the position is unless there is a way to conduct electricity across Long Island Sound without this cable, I don't understand how the cable is not one that is, among many other purposes, and the main purpose is conducting electricity. The cable is also designed to make sure that the electricity gets across and it needs oil. And I don't mean to suggest that necessity and purpose are the same thing. But part of the purpose of the cable, it seems to be, is to make sure that the oil gets through so that the electricity can get across. What am I missing about that? I don't know if I agree with that. Because again, the evidence in the record is, and I realize this is a closed loop system, but the evidence in the record is that for the most part the oil is static in the system. And so you're not having this constant, you know, it's not as if the purpose of the cable is to flow oil back and forth through everything.  But a purpose, a purpose. I don't even think, I would submit to Your Honor that it's not even a purpose. Again, it uses the oil. It needs the oil, absolutely. And all I can say to you is, you know, when you compare, and I think it's appropriate to compare the Clean Water Act provisions, but again, our position here is that this is a Clean Water Act bill. And when you put the Clean Water Act definition side by side with OPA, you cannot but help but draw the conclusion that OPA facilities are intended to be something different. And that the fact that a facility merely uses oil in connection with its purpose, which is what the cable does, does not transmute that facility into the type of facility that OPA was intended to capture. Now, we, you know, we have the language of OPA itself. We have the Clean Water Act provisions. We have the fact that at the time OPA was enacted, they had the Clean Water Act available. They only took portions of the Clean Water Act definitions with them into OPA. There is, as we pointed out in our brief, very limited case law in, you know, in this space. But at least the one case that did specifically address this issue, I think, you know, explains to us or gives us guidance that, you know, you don't simply just say, well, because of an industrial piece of equipment that uses oil somehow in its purpose, i.e., a freight train that is transporting that obviously needs diesel oil to further its purpose of transporting commercial, you know, cargo, that that transmutes a spill from that freight train into an OPA spill. And I think the same analysis applies here. And I think the district court was correct. And I think the district court applied, you know, looking at the statutes, looking at the scheme, looking at the interplay between OPA and the Clean Water Act, the district court properly concluded that this is not an OPA facility. It's a Clean Water Act facility. So this is Judge Nardini. May I jump in with a question? Yes, certainly. I have a couple questions. One is your brief seems to take this approach of focusing on the purpose. What is the purpose? Could you articulate in words what is the purpose that you would assert is the purpose here? I mean, is it for the purpose relating to exploration and production of petroleum? What is this limiting purpose? You say you should look at all the other terms and come up with a limiting purpose. Could you articulate what that purpose is? Yes. So, yes, I think that when you're talking about I'm reading the statute and that when you're looking at what what do they mean when they talk about one or more of the following purposes? And what we suggest is that in connection with, you know, looking for further guidance, you look at the terms exploring for drilling, for producing, storing, handling, transferring, that the facility definition is geared towards equipment that is used and has a purpose within the petroleum trade. Well, I guess what I'm wondering here is, you know, I understood sort of your claim that this should be relaying on things like exploration and production. But the petroleum trade, meaning, does it have to be used to be selling oil to somebody else? No, no, no, no. What does that mean? I'm not sure. No, no, no, no, no. So, I mean, you have I mean, look, you have what you have. You will have you know, you can have map. If you look at offshore facilities, for instance, right, you can have offshore tank farms. You can have offshore facilities that are drilling for oil, not for oil. You can have you know, you have pipelines that are transporting copious amount of oil from one place to the other. And those pipelines serve one purpose only. One purpose is to transfer oil. Maybe let me put it this way, because I can understand, you know, if I can understand how those examples under anyone's definition fits in. You know, the Deepwater Horizon starts leaking and everyone agrees it's covered. Let me ask you this. Let's say your barge had crashed into the shore where the pressure storage tanks for this particular cable system. Let's say they happen to be right up against the shore. Right, because they need to be super close to the pipeline. Maybe that's true. Maybe it's not true. But let's just say the prow of the ship had crashed into these tanks and they burst forth with oil into the Long Island Sound. Is that covered or not covered? Again, I have to imagine that they're not a mile in. That may be covered if those storage tanks, which would, if you think about it, there'd be a significant spill at that point. Right, so here's my question then. If that's true, what has that got to do with the petroleum trade? That petroleum was sold, owned by NYPA, and the only thing that was ever going to happen to that oil is it was going to get pumped back and forth in the cable. You see, that's why I'm trying to test what this purpose limitation is, because I don't understand what this, how you would even define this other purpose that you're trying to discern from the statute. Right, because that's out of the trade, right? Do you have another way to explain, to articulate what this limiting principle is? If I can, and Your Honor, in some ways, I'm not trying to suggest that the purpose within here is only limited to the petroleum trade. I think that provides some guidance. Great, but let's say we have to write an opinion that says this is what the purpose is. Let's say that the purpose is colon, and then there's a quote. What would be the quotation that you would love us to insert into our opinion? I would say the purpose is, I would quote the statute, and I would suggest to Your Honors that you do not have to determine, in this context of the case, what purposes need to be enumerated. I think the question is, does this table, in its purpose, fit within the statute? So I think it's a little bit of a different analysis. You don't have to – Well, I can say that's not very helpful, because here we are debating what the statute means, and I'm trying to ask for an explanation that would seem to be consistent with what you're arguing. But if we just go back to the language itself, it's not very helpful. So let me ask a different question, which is the government and I think the Bouchard are arguing that effectively what you're arguing for and what the district court concluded was reading a primary purpose requirement into the statute. And isn't it true that there are many, many statutes out there in all sorts of contexts where Congress requires something to be a, quote, primary purpose, and this is not one of those statutes? So it seems like you're arguing about what I think one of my colleagues may have described as an ultimate purpose. Isn't that ultimately what you're arguing for is to say, well, sort of the cosmic purpose, the ultimate purpose down the road for why this cable exists is for the sake of generating electricity? But even if something was custom made for the purpose of transferring oil, if the reason it's transferring oil is something that's not in the list, if it's transferring oil for the sake of generating electricity, it's not covered. So let me ask you, are you in effect asking for a primary purpose requirement? And if not, explain why. Okay, yes. I will answer that question, and then I want to go back to the prior question to returning first to the question. No, we are not advocating that you only look to the primary purpose. I do not accept that under primary or incidental that this cable has as its purpose, has as a purpose, a purpose, the storage or transferring or handling of oil. I do not accept that. And if you look at the definition. But it clearly does, right? And let me just ask. It does. But it does in the sense that it's designed to do precisely what, to do precisely that, to hold and transfer oil. It does, well, Your Honor, if I may, the statute does not say that a facility includes any piece of equipment which stores, handles, transfers. It doesn't say that. And if it did say that, I would agree with you. It doesn't say that. It says instead, which is used for one more of the purposes. And I submit to you that that language is different than saying the district court recognized that the cable does, in some respect, store, handle, transfer. It does do that. But the statute doesn't use that language. But I don't understand. You haven't given me an alternate understanding of what purpose is. So my understanding of this cable, for example, let's just look at the cable without the onshore facilities, right? That the purpose, one of the purposes of the cable is to keep an electrical cable, these conductors, which presumably are made of copper or some sort of metal. And part of the purpose of having the cable, which I assume is sort of a big metal container that's airtight, is to also ensure that there's all this oil that remains around the electricity, the electrical conductors. And to swish it back and forth to some extent to maintain some sort of steady pressure. And that the reason that there's this carapace around it all and not just a big piece of rubberized cable is because you need to have that oil in there. And my question then is, why are you looking only at the purpose of the electrical conduction and not the purpose of this big metal carapace that's also designed to keep oil at a constant pressure? And I hear what you're saying, but it's difficult and I'm not trying to be disingenuous. If that is the case, then any piece of equipment, any piece of equipment that uses oil in any fashion would be a facility, any piece. I think your argument, as I understand it, is that that completes necessity with purpose. Correct. It's incidental. And again, if you look at the oil field definition, it talks about the oil field operational equipment that Council has relied upon. It talks about equipment where oil is present solely to support the function of the apparatus. Again, necessity, incident, reliance upon is not the same thing as purpose. And to go back to the earlier question, I think, Your Honors, and I'm going to propose this to you, is that when Congress, the impetus behind OPA was the Exxon Valdez. And when Congress sat down and drafted OPA, and again, it applies to facility spills and vessel spills. It defines vessel as every vessel, the word every. When it got to facility, it had a more limiting, it used more limiting language. It didn't say every facility, period, that has any oil whatsoever. And I would suggest to you that perhaps, perhaps a reason for doing that is because although the table across seven miles contains 2,500, I think it was gallons, of fluid. If you think about it, at any one particular point, that's not overly significant. And so perhaps what Congress had in mind was that, look, when we're talking about facilities, what we're really trying to nab is the catastrophic type spill. Vessels, in contrast, when a vessel's on the water, a vessel that contains, you know, any amount of cargo, is going to have significant amounts of oil on board, whether it's petroleum or some other product. And so it made sense to say, well, can I get all vessels? But when it comes to spills- Well, doesn't the statute apply to any vessel, meaning small yachts, any recreational vessel as well? You know what, Your Honor? To be frank, I don't know if it speaks to small yachts. I'm not aware. So I don't want to say yes or no on that. I mean, I think your adversary makes the argument that the broad approach to vessel is one reason we shouldn't assume that there was not a similar broad approach to facility, if that's consistent with the plain language of the provision. That's the argument that I recall in the brief. That was from, yes, I think the USA made that argument. But I would suggest to you it's the opposite. If you put the two definitions side by side, because vessel definition uses the word every, and it talks about every contrivance that is used or capable of being used as a means of transportation on water. And so Congress certainly knew how to use the word used. But yet when they defined facility, they didn't add in the definition or any facility which uses or is capable of using oil. They didn't do it. And so what we're left with is a statute that all we have really to guide us, or not all, but what guides the analysis predominantly is the words of the statute. And when you compare the two provisions, the conclusion that we submit should be reached is that facility is something that is a little more narrow under OPA than it is under Clean Water Act. So are there any more questions? No, thank you. Thank you very much. Let's hear rebuttal. Thank you, Your Honor. The first, I want to address three points. And the first is Council's comment that this, in the beginning of her presentation, that this is a Clean Water Act bill, and that there's a remedy under the Clean Water Act. There's no remedy under the Clean Water Act. The Clean Water Act provides for civil fines and penalties only by the government. And OPA was intended to amend the Clean Water Act and to provide a comprehensive federal framework for oil spills that covered everything that hadn't been covered before. That was one of the intents of OPA. So when Council says that, you know, that portions of the Clean Water Act were taken into OPA and that OPA should be narrower, that's really not the case. OPA came after Clean Water Act to fill in the gaps, to fill in the patchwork, and to provide a comprehensive framework. So it's a better reading to have the OPA, the facilities under the Clean Water Act, definitions of onshore facility and offshore facility, and the same verbatim definitions under OPA to be coextensive so that all the facilities that are identified in the Clean Water Act are the same facilities that are identified under OPA, it's just that OPA addresses them for oil spills and hazardous substances are covered by another statute, by the CERCLA. The second point is the OPA definition for facility doesn't exclude facilities that use oil. It provides for purposes of the facility that are in connection with oil, and the containment of oil beneath Long Island Sound, in order for this facility to function, is a purpose within the meaning of the liability definition. And... The third point is the significant amount of oil. OPA applies to all oil spills, and significance is not covered in the statute, it's intended to be broad, and facilities should be interpreted equally broadly. Do you have one more minute? I have one more minute. Can you... This is Jed Lurie, and I asked your adversary this. Would you distinguish for me how we can distinguish between necessity and purpose in connection with trying to interpret this particular facility provision? So, because the oil is necessary for the function, it needs a purpose? Well, no. I think that the argument is, on the other side, is that your argument conflates necessity with purpose. And you've heard a number of questions about what the meaning of purpose or purposes is, and obviously whether one side or the other is advocating for a primary purpose test. But one view of it is that the oil here is necessary. It's not the purpose of the cable, it just is necessary for the electricity to travel across the Sound. Right. Well, the facility has to be used for one of these purposes in connection with oil. The necessity argument comes in when you refer to that the facility was designed to function with oil in it. I'm not sure that I followed the question. Yeah, so I think it's a core part of the counter-argument. And it goes back to just Livingston's reference to the Honda Civic, right? So, in order to run, to actually have the Honda Civic work, you need the oil. But no one, I don't think, would say that a purpose of having the Honda Civic is to produce, store, handle, transfer, process, or transport oil. And they do one of those things, but that's not a purpose. It's just necessary to have oil in order for the car to run. Same thing here. It's necessary for this cable to operate properly. In other words, for the cable to actually conduct or help conduct the electricity across the Sound, to have the oil to lubricate the cable from one end to the other. What am I missing about that? And why is that not a necessity issue as opposed to a purpose issue? Well, the purpose really goes more to the containment of oil. The cable could be viewed as a pipeline. If you take out the core conductor, it is analogous to having a pipeline going across Long Island Sound. So, purpose with respect to the use of oil, with respect to a facility that's used for one or more of the following purposes. Okay. Well, it is necessary to use the oil in the cable. But the definition goes to whether the facility is used for one or more of the following purposes. I don't know. I'm getting turned around. Maybe the answer is that necessity and purpose are not mutually exclusive concepts. So, it can be necessary and also part of the purpose, quite subsidiary purpose here, to make sure that what's needed to be done, that is, the primary purpose of conduction of electricity across the Sound, gets done. Right. I mean, the primary purpose is not part of the analysis for the facility definition. This has to be one of the purposes, is to store oil. And the EPA, when it looks at these oil-filled operational equipment, it defines the equipment that has oil in it for the apparatus to function, to use and store oil. So, it's purpose is to store oil for the apparatus to function. Would one of your responses, potentially, just playing off this interesting notion of necessity, would one of your arguments be that the more necessary the use of the oil is, the closer it folds into the purpose? It must be part of the purpose. That if it can't happen without it, then it must be sort of purposefully used. Well, yeah. Then, I guess there's a scale that, yeah, the larger the necessity, the more it comes into the purpose for being of a facility. And just to go back... And when it goes down... It seems to me one of the challenging hypotheticals that the other side poses for you is the Honda Civic, which I think is what you brought up. You know, the Honda Civic is just driving along and, I don't know, goes over a guardrail and goes into the Sound and starts leaking. I mean, is your position that the Honda Civic, you know, yeah, you know what, the open that rod and the leak counts? Or would your argument be, look, it's not covered because it's neither storing, handling or transferring oil. And, you know, sort of moving it around within itself is not transferring it. And it's not really handling it in the sense of like doing anything to change it. And it's not storing it for another day. It's actually using it or something like that. I mean, then you'd have to, I guess, argue about whether the gas tank is actually storing it because maybe someday it's going to use it. Or is your point that, no, look, it's that broad? Is the Honda Civic covered or not? The Honda Civic, it is, I think that the Coast Guard would view the Honda Civic to be a facility because it would be, I mean, they would target the owner of the Honda Civic to be the responsible party. I don't know that they would get into a facility analysis. But when you have a piece of equipment or device that discharges oil into navigable waters, the owner operator of that device is a responsible party for the oil spill. I think the Honda Civic must, under your definition and your view, would have to be covered if it were involved in an accident of this sort. I think there would be an argument that it's covered. Because it's way out on the scale of hypotheticals, so it's hard to assess. But as a practical matter, the Coast Guard has to look at from where the oil was discharged. And OPA was drafted to have two places from where oil is discharged, either the vessel or the facility. And these definitions are in the liability section and they're very broadly, they should be broadly construed and they're broadly drafted to provide a comprehensive federal framework for liability. Thank you, Mr. Foley. If that concludes the questioning from my fellow panelists, I think it does. Thank you. Let me thank both of you. Extremely well argued on both sides. Very, very helpful. And that will conclude argument. And so I believe we can adjourn court. Thank you, Your Honor. Thank you, Your Honor.